UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,                                              Case No. 09-cr-20404

v.                                                      HONORABLE STEPHEN J. MURPHY, III

ARMANDO FELIX TREJO,

    Defendant.
_____/

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE** (docket no. 14)

Defendant Armando Felix Trejo ("Trejo") is charged in a second superseding indictment with seven counts of transportation of child pornography, 18 U.S.C. § 2252A(a)(1) and one count of possession of child pornography, 18 U.S.C. § 2252A(a)(5)(B). Docket no. 20. The evidence supporting the charges results from separate incidents where police, without a warrant, searched and later seized from Trejo's father's home, two separate computers containing child pornography.

On November 6, 2009, Trejo filed a motion to suppress the evidence from the search, arguing that government agents seized the computers from his father's home in violation of Trejo's Fourth Amendment rights. On November 9, 2009, the government stipulated that the search warrant executed March 13, 2009 lacked probable cause and agreed that the evidence obtained from the execution of the warrant is not admissible in the government's case-in-chief. Accordingly, the suppression motion relates only to the searches and seizures of computers by police on July 17, 2008 and August 27, 2009.

The Court promptly convened an evidentiary hearing on the motion. The parties, however, stipulated that more time was necessary to prepare for the hearing, and the Court

rescheduled it. On December 22, 2009, Court held an evidentiary hearing, but the parties indicated that Trejo's father would be unable to testify because he was stationed overseas with the U.S. Military at the time. The Court again rescheduled the hearing. On January 29, 2009, the Court held the evidentiary heard with Trejo's father testifying via telephone from Afghanistan. Trejo's mother, Rose Trejo, also testified, as did Sergeant Detective Joseph Brian with the Oakland County Sheriff's department. After the hearing, the parties requested time to submit additional briefing. The Court obliged and both parties submitted supplemental briefs. The Court has considered all the briefing and the testimony of the witnesses and is now ready to adjudicate the motion.

## FACTUAL BACKGROUND

The Court makes the following findings of fact after having heard the testimony of the witnesses. *See* Fed. R. Crim. P. 12(d).

On July 17, 2008, Detective Sergeant Joseph Brian and Detective Carol Liposky of the Oakland County Sheriff's office acted on a lead from an FBI agent regarding some child pornographic images sent from an American Online email account linked to Trejo. Brian further investigated the matter and discovered that Trejo resided in Pontiac, Michigan. Brian and Liposky went to Trejo's residence in Pontiac to gather information and to investigate. At the time, Trejo resided in his father's home with his mother and father, along with his brother and nephew. When Brian arrived at the home, Trejo was not at home, but his father, Raymond Trejo ("Raymond"), was.

The officers arrived in plain clothes and knocked on the door to announce their presence. Raymond answered the door and greeted the officers. The three spoke outside on the porch briefly before Raymond invited the officers inside. Raymond asked the officers if they had come to his house to investigate a crime related to child pornography.

2

The officers said they had, and that some child pornography had been sent from Raymond's home address through a computer. Raymond invited the officers into the home and led them to the kitchen. Raymond directed the officers to the computer in the kitchen nook area. Raymond told Brian it was the "family computer" and everyone in the house, including his grandson, used it. Brian explained that since images were sent from that computer to another in a different state, there may be more images stored on the computer. Brian said he would like to take a look at the computer and that if he did not find any illegal images on it, it would be returned. Raymond said that he understood and said, "yeah, you guys can take it and do what you need to."[1]

On August 27, 2009, Detective Brian, along with FBI agents, returned to Raymond's residence in Pontiac, Michigan with an arrest warrant for Trejo. Trejo was arrested in his home. Trejo's mother, Rose Trejo ("Rose"), was at the home and spoke with the officers and agents after they arrested Trejo. Officers noticed another computer present in the same location in the kitchen area where they had seized the computer in July 2008. Rose testified that she spoke with a female officer who told Rose that she would have to take the computer. Brian was also present at the conversation. Brian testified that Rose said that was fine. Brian asked Liposky and another agent to come into the residence and preliminarily examine the computer. When they turned on the computer and clicked on one of the user profiles (without entering a password), the agents discovered inappropriate pictures on the computer desktop. At this point Brian told Rose about the pictures and

---

[1] Raymond testified that in response to Brian's statement, Raymond stayed silent. The Court has weighed credibility and finds that Raymond did not stay silent, but rather told Brian he could take the computer to determine if it had any child pornographic images on it.

3

asked if he could take the computer. Initially, Rose was hesitant, but ultimately agreed to let the officers take the computer, telling the officers, "Take it."

Rose's testimony is slightly different on this account. Rose testified that on the day Trejo was arrested, Rose spoke only with a female officer, and not detective Brian, about the computer the agents ultimately seized. Rose did, however, indicate that she spoke with several officers and was not sure if she spoke with Brian that day. She admitted she may have been confused and mixed up the days because the following day, she spoke with Brian at the federal courthouse. Rose said the female officer said that she would have to take the computer, which Rose initially objected to, saying it was the only way to communicate with her husband while he was overseas.[2] The female officer (according to Rose, but more likely, officer Brian) said she would send in a computer expert to check the computer. Rose testified that after the technician checked the computer and found inappropriate pictures, the officer said she would have to take the computer and just took it. Rose said she just shrugged her shoulders and shook her head. When questioned by the Court, Rose indicated that she stayed silent and shrugged her shoulders. She said she did not feel she had an option. The Court finds that Rose told the officers to take it, but even if she stayed silent, she affirmed through her conduct that the officers could take the computer.

On both occasions, the computers were located in the corner of the home's dining room, adjacent to the kitchen and accessible to all members of the home. Both computers were considered by Raymond, Rose, and the rest of the household members to be available for anyone's use. Extended family members who did not live in the home

---

[2] Rose had installed a computer program called Skype, which allowed her to communicate via video conference with her husband overseas.

frequently used the computer while visiting. Raymond would also allow members of his military unit to use the computer during lunch periods to check email and other online accounts. The computer was in essence available to anyone who entered the home.

The computers contained approximately seven user profiles. Although Raymond's personal user profile, as well as one other user profile required the administration of a password to access the profile, the profile for "Mando" did not require that the user input a password. When officers viewed the Mando profile, they were able to access the profile without entering a password.

Neither Raymond nor Rose signed any sort of "consent" or other form at the time officers removed the computers from the home.

**DISCUSSION**

Trejo argues that the two computers at issue in this motion were taken in violation of his Fourth Amendment rights to be free of unreasonable searches and seizures. Specifically, he asserts that his parents lacked the authority to consent to the search and seizure of the computer. He further argues that even if his parents had authority, their consent was given involuntarily.

The government responds with three arguments as to why the evidence should not be suppressed: 1) Trejo lacks standing to challenge the search and seizure; 2) even if he had standing, Trejo's parents had actual or apparent authority to consent; and 3) their consent was voluntary.

I. Trejo's Standing to Challenge the Search

The government contends that Trejo lacks standing to challenge the search of both computers. Standing in the Fourth Amendment context is not a distinct concept from substantive Fourth Amendment doctrine similar to Article III standing. *See Rakas v. Illinois*,

5

439 U.S. 128, 139 (1978).  Rather, "[t]he question is whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained [as a result of] it.  That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect."  *Id.* at 140.

The Fourth Amendment protects people, not places, and it provides protection for citizens wherever they have a legitimate expectation of privacy.  *Minnesota v. Olson*, 495 U.S. 91, 97 n.5 (1990) (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)).  If a defendant does not have a legitimate expectation of privacy in a place or object, he lacks standing to challenge the illegality of the search.  The defendant has the burden of establishing standing.  *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988).

The Court finds that Trejo has met that burden here.  Whether a person has a legitimate expectation of privacy depends on his satisfaction of a two-part test: 1) he must manifest an actual, subjective expectation of privacy; and 2) that expectation is one that society is prepared to recognize as legitimate.  *Katz*, 389 U.S. at 361 (Harlan, J., concurring); *United States v. Hunyady*, 409 F.3d 297, 301 (6th Cir. 2005).  A court considers the totality of the circumstances in determining whether a person has a legitimate expectation of privacy in an object or place.  *United States v. Smith*, 263 F.3d 571, 586 (6th Cir. 2001).  Factors to be considered include ownership, lawful possession, or lawful control of the premises searched, *Hunyady*, 409 F.3d at 301, including whether the defendant had the ability to exclude others from the area searched.  *See Sangiento-Miranda*, 859 F.2d at 1510.

Expectations of privacy in the contents of a computer are likened to expectations of privacy in other types of containers, such as suitcases or briefcases. *See United States v. Aaron*, 33 F. App. 180, 184 (6th Cir. 2006) (unpublished). "Because intimate information is commonly stored on computers, it seems natural that [personal] computers should fall into the same category as suitcases, footlockers, or other personal items that 'command a high degree of privacy.'" *United States v. Andrus*, 483 F.3d 711, 718 (10th Cir. 2007) (citation omitted).

In this case, Trejo had a reasonable expectation of privacy in the content of the first seized computer. The evidence demonstrates that Trejo owned the computer, and while that fact alone is not determinative, it is substantial. The fact that he allowed others to access the computer does not completely diminish his expectation that the contents of the computer would be kept private, at least among his family members and friends of his father's who used the computer from time to time. *See Andrus*, 483 F.3d at 718; *see also Aaron*, 33 F. App. at 184 (noting that defendant had privacy interest in a computer akin to a suitcase or briefcase even where live-in girlfriend had access). Even though others had access to it, and even though he did not use a password, the Court finds that Trejo has demonstrated enough of an expectation of privacy in the computer to allow him to challenge its search and ultimate seizure.

The case is closer, however, with respect to the second computer, which Rose testified was purchased by Raymond and not owned by the defendant. Ownership, however, is the not the touchstone of standing to challenge a search and seizure. The Supreme Court decided long ago that the Fourth Amendment's protections do not depend on the parameters of a state's property law, but rather on whether a person maintains a reasonable expectation of privacy over an object or place. *See Katz*, 389 U.S. at 361.

Ownership may be a factor, but it is not dispositive. *Cf. Hunyady*, 409 F.3d at 301 (listing the factors a court must consider).

Although Trejo did not own the second computer, he nevertheless maintained a sufficient expectation over the computer and its contents such that he has standing -- just barely -- to challenge its search and seizure. The computer was located inside his father's home, in which Trejo permanently resided. A lawful resident of a home, even though not the owner, the Court believes, still has a reasonable expectation of privacy over the contents inside the residence, even if located in common areas. Further, the presence of Trejo's profile on the computer demonstrate that he had *at least some* control or ownership interest in the computer, which further supports his expectation of privacy. The Court concludes that Trejo's expectation of privacy in his father's computer was one society is prepared to accept as reasonable, even if reluctantly. *See Katz*, 389 U.S. at 361.

The Court notes that the government has made a strong argument that Trejo did not have expectations of privacy with respect to both computers that would allow him to challenge the seizures. The government states that each computer was made openly available in a common area of the residence owned by his father. Moreover, multiple people, including extended family members and friends, had access to the house and used the computers. The government contends that Trejo was "little more than a house guest with visitor access to a computer contained therein. As such, [Trejo] had no expectation of privacy in [the computers] and does not have standing to object to the search of either computer." Def. Br. p. 6. Although the government makes a strong argument on this front, the Court ultimately disagrees with it, and finds that the arguments of counsel are more properly considered in the third-party consent context discussed below. Trejo's permanent residence at Raymond's home, and use of the computers therein, even though located in

8

a common area and available for use by other guests invited into the home, are sufficient to allow Trejo to challenge the searches.

The Court, therefore, finds that Trejo had a reasonable expectation of privacy in the two computers, sufficient to permit him to challenge the validity of the search and seizure. *Cf. Guest v. Leis*, 255 F.3d 325, 333 (6th Cir. 2001) ("Home owners would of course have a reasonable expectation of privacy in their homes and in their belongings -- including computers -- inside the home."); *United States v. Lifshitz*, 369 F.3d 173, 190 (2d Cir. 2004) ("Individuals generally possess a reasonable expectation of privacy in their home computers.").

II. Third Party Consent

Since Trejo has standing to challenge the warrantless searches of the computers, the Court must determine whether the officers' conduct complied with the Fourth Amendment.

A. Governing Fourth Amendment Law

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. Generally, for a search of a home or personal effect to be reasonable, it must be conducted pursuant to a warrant based upon a judicial officer's determination of probable cause. *See Payton v. United States*, 445 U.S. 573, 586 (1980); *Thacker v. City of Columbus*, 328 F.3d 244, 252 (6th Cir. 2003).

There are, however, judicially created exceptions to the warrant requirement. One exception recognizes the validity of searches with the voluntary consent of an individual possessing authority over the place or effect. *See Georgia v. Randolph*, 547 U.S. 103, 109 (2006). That individual might be the homeowner against whom evidence is sought, or a fellow occupant who shares common authority over property when the suspect is absent

("actual authority"). The consent exception also extends to entries and searches with the permission of a co-occupant, whom the police reasonably, but erroneously, believe to possess shared authority as an occupant ("apparent authority"). *Id.* Common authority rests on "mutual use of the property by persons generally having joint access, or control for the most part, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (citations omitted); *see United States v. Waller*, 426 F.3d 838, 846 (6th Cir. 2005).

Whether apparent authority exists (in the absence of actual authority) depends on consideration of all the surrounding circumstances. *United States v. Waller*, 426 F.3d 838, 846 (6th Cir. 2005). The government may not establish that its agents reasonably relied upon a third party's apparent authority if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry. *Id.* "If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to 'mutual use' by the person giving consent, 'then a warrantless search is unlawful without further inquiry.'" *Id.* (citation omitted). Where the circumstances presented would cause a person of reasonable caution to question whether the third party has mutual use of the property, warrantless entry without any further inquiry is unlawful. *Id.*

In *United States v. Morgan*, 435 F.3d 660 (6th Cir. 2006), the Sixth Circuit dealt with the issue of third party consent to a warrantless search of a family's computer. In that case, the defendant's spouse consented to the search of the family's computer located in the defendant's basement, a common area the spouse had complete access to. *Id.* at 662. The Sixth Circuit found the spouse had apparent authority to consent to the computer

search given that it was located in a common area, she told the police she regularly used the computer, and neither she nor her spouse had individual user names or passwords for the computer. *Id.* at 663. Furthermore, she told the officers that she had installed programs on the computer – a fact that further supported the conclusion that she had joint access to the computer. *Id.* at 663-64.

The Tenth Circuit confronted the same issue in *United States v. Andrus*, 483 F.3d 711 (10th Cir. 2007). There, law enforcement searched a computer from the defendant's father's home, where the defendant also lived. *Id.* at 713. The defendant's father consented to a search of the home including any computers in the home. The father stated that when the defendant's bedroom door was open, the father felt free to enter the room, but always knocked if it was closed. *Id.* Officers searched a computer in the defendant's open bedroom and found child pornography. *Id.* The court found that defendant's father had apparent authority to consent to the search of the defendant's computer. The conclusion was supported by the following: 1) officers knew the defendant's father owned the house and lived there with other family members; 2) officers knew the father paid the internet bill; 3) officers knew the father had access to the defendant's room at will; 4) officers saw the computer in plain view on the desk in defendant's room and it appeared available for use by other household members; 5) the father did not do or say anything to indicate his lack of ownership or control over the computer when he was asked for consent; 6) the father led police to defendant's bedroom, and even after watching police work on the computer, remained silent about any lack of authority he had over the computer. *Id.* at 721.

The defendant in *Andrus* tried to argue that since the computer was password-protected the officers should have known the father lacked consent, a fact they would have

known had they asked the father.  The court rejected the argument, finding that in light of the father's prior statements and actions, whether the father had authority to consent was not ambiguous so the officers did not need to question him further.  *Id.*  The court refused to take judicial notice that password protection of home computers is so common that a reasonable officer ought to anticipate it and ask questions to resolve any ambiguities regarding authority to consent.  *Id.*  The court concluded that the facts known to the officers at the time the search began created an objectively reasonable perception that the father was at least one of the computer's users, which was sufficient to give him apparent authority to consent to the search.  *Id.* at 722.

*Morgan* and *Andrus* both indicate that an officer's awareness of password protection on a computer or certain files on the computer, may eliminate, or at least bring into question, an officer's objectively reasonable reliance on a third party's apparent authority to consent to a search of a computer and files.  In the absence of knowledge about password protection on a computer, however, an officer can reasonably rely on the otherwise apparent authority of a third party to consent.  Modern forensic technology may present problems in this respect, in that such technology may prevent forensic examiners from ever discovering whether a computer or some of its individual files are password-protected.  This is because the software used to search a computer's files may not necessarily detect user passwords.

Courts have indicated that the use of such software, and especially the *deliberate* use of such software to avoid or bypass password protection, may eliminate apparent authority. *See, e.g.*, *Andrus*, 483 F.3d at 722 n.8 (indicating in dicta that an officer's use of forensic software which overrides password protection without indicating whether such protection exists, may be subject to question); United States v. Andrus, 499 F.3d 1162, 1163 (10th

Cir. 2007) (denying rehearing en banc, noting that among the factors *not* present in the matter, and for which there was no factual development, were the extent of capability and use of password protection or user profiles on home computers, the capability of forensic software in detecting the presence of password protection or user profiles, or the degree to which law enforcement confronts password protection or user profiles on home computers); *United States v. Buckner*, 473 F.3d 551, 553 n.1 (4th Cir. 2007) ("The parties agree that none of [defendant's] files were encrypted. Nor is there any contention that the police officers *deliberately* used software that would avoid discovery of any existing passwords."); *Buckner*, 473 F.3d at 556 n.3 ("We do not hold that the officers could rely on apparent authority to search while simultaneously using mirroring or other technology to intentionally avoid discovery of password or encryption protection put in place by the user. *See supra* note 1.").

B. <u>Whether Raymond and Rose had Apparent Authority over the Computers</u>

In this case, the Court does not need to address whether Raymond and Rose had actual authority to consent to the search and seizure, because it finds they had apparent authority to consent. *See, e.g., Morgan*, 435 F.3d at 664 (expressing no opinion as to whether spouse had actual authority to consent to search of computer, in light of conclusion spouse had apparent authority). Even if the search cannot be upheld based on actual authority -- an issue on which the Court takes no position -- the Court upholds the search based on the apparent authority of Trejo's parents to consent.

As stated above, whether a third party has apparent authority to consent to a search and seizure depends on whether officers reasonably believe the third party had mutual use by virtue of joint access, or control for most purposes, of the item searched and seized. Here, officers were told that both computers were the "family computers," a fact further

supported by the computer's location in the family's dining room and the fact that all members of the household used the computer. Since the computer was the family's, officers could reasonably believe the parents had control over the computer for all purposes. This reasonable belief never came into question during the search and seizure. The parents never told officers they could not search or remove the computers because they lacked ownership or control over them. Even while officers were removing component cords from the computer towers, Raymond and Rose never indicated to officers that they did not have the authority to allow the seizure of the computers. No ambiguity with respect to whether the parents had authority to consent to the search and seizure of the computers ever arose during the entire time officers were at the home. Although Rose initially indicated a hesitancy in allowing officers to remove the computer, that hesitancy did not relate to whether she had authority to allow officers to take the computer, but related to potential inability to speak with her husband overseas using the computer, a hesitancy she later abandoned.

The situation here is similar to those faced by the courts of appeals in *Morgan* and *Andrus*, discussed above. As with the spouse in *Morgan*, who consented to the search of the couple's computer located in the basement, a common area to which the spouse had complete access, Raymond and Rose consented to the search and ultimate seizure of the two computers located in the kitchen area, a common area to which both had complete access. Additionally, like the spouse in *Morgan*, Raymond and Rose indicated to officers that they had access to and, in fact, frequently used, the computers. Raymond and Rose created their own profiles on the computer, of which the officers became aware when they searched the computer, a fact which further supported the reasonable belief that they had access to the computers.

Again, in *Andrus*, the defendant owned the computer located in his bedroom. Officers were notified by the defendant's father that the father had unlimited access to the bedroom. The father said nothing that would indicate to officers that he did not have access to the computer. Like the officers in *Andrus*, Detectives Brian and Liposky were told by Raymond and Rose that they had common access to the computer and used it at will. They indicated it was the "family computer." Rose and Raymond mentioned nothing that would have indicated to the officers that they did not have access to and authority over the computer. Based on the words and conduct of Raymond and Rose, the officers could have reasonably believed that they had authority to consent to the search and seizure of the computers.[3]

There is one difference between this case and *Morgan* and *Andrus* that might require finding Raymond and Rose lacked apparent authority to consent. In *Morgan* and *Andrus*, there were no user profiles on the computers. *Morgan*, 435 F.3d at 663; *Andrus*, 483 F.3d at 721. In this case, there *were* user profiles on the computer, some of which were accessible by the administration of a password. And at least with respect to the second computer, officers became aware of the profile when they preliminarily searched the computer at Trejo's home.[4] Trejo's profile ("Mando"), however, did not require a password. One could argue that the officer's awareness of the various profiles on the computer would create an ambiguity as to whether Rose had authority to consent to the search of the computer's profile. In light of the ambiguity, officers would have had a duty to inquire

---

[3] There is absolutely no indication that the offices deliberately used any type of forensic software which allowed them to bypass password protection or even the presence of password protection on the computers and thereby eliminated any apparent authority. Rather, the testimony of Brian is that officers were able to access the child pornographic pictures simply by clicking on the "Mando" profile icon.

[4] The record is not clear on whether or not officers preliminarily searched the first computer while at the Trejo home before seizing the computer.

15

further as to Rose's authority to consent to the search of the Mando account and ultimate seizure of the computers. *See Waller*, 426 F.3d at 846.

Although Trejo does not expressly make this specific argument, even if he did, it would be unavailing. The Court does not believe that the mere presence of separate user profiles on a computer would, as a general matter, disturb an officer's otherwise reasonable belief that a third party had consent to search a computer or even that profile. Whether the defendant had a *password*, regardless of whether he maintained a separate user profile, seems to the Court to be the relevant question. *Cf. Trulock v. Freeh*, 275 F.3d 391, 403 (4th Cir. 2001) ("Although [third party] had authority to consent to a general search of the computer, her authority did not extend to [defendant's] password-protected files."); *Andrus*, 483 F.3d at 718 ("Courts addressing the issue of third party consent in the context of computers, therefore, have examined officers' knowledge about password protection as an indication of whether a computer is 'locked in the way a footlocker would be.'").

In the context of general social expectations, different users of the same computer, simply by creating separate user profiles (without protecting them with a password), do not thereby demonstrate to the world that others do not have access to the profile and files found therein. A user may choose to create a user profile -- instead of using another's profile -- for purposes of saving his or her preferred settings in order to avoid having to reconfigure them each time they use the computer after another has used it and changed the settings. Or, a user may do so in order to have a personal photograph saved as the desktop background. Other reasons exist as well. These reasons would not indicate, by themselves, an intent to exclude others from using or accessing the profile. If a user of a communal computer wants to limit the access of other co-users, he may do so with a password. In the absence of a password, however, a officer may reasonably conclude,

without further inquiry, that the user has allowed others access to his profile. Trejo has referred the Court to no authority to the contrary, nor has the Court through its independent research found any such authority. Therefore, the mere fact that Trejo had a separate user profile on the two computers cannot, by itself, create ambiguity regarding Raymond and Rose's apparent authority to consent to the search of the profile, which officers would have had to resolve before searching.

3. Whether the Consent was Given Voluntarily

Trejo argues that his parents' consent on both occasions was given involuntarily. In whatever form consent is given – words, gesture, or conduct – consent to a search only has effect if given freely and voluntarily. *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (citing *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). If challenged, the government bears the burden of demonstrating voluntariness by a preponderance of the evidence. *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009). Consent must be proved by clear and positive testimony, and, to be voluntary it must be "unequivocal, specific, intelligently given, and uncontaminated by any duress or coercion." *Id.* Because Trejo has challenged the validity of the consent, the government must establish that Raymond and Rose's consent was given voluntarily.

Whether consent was given voluntarily is a question of fact to be determined by the court from the totality of the circumstances. *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). The test for voluntariness is whether the will of the consenting party has been "overborne" and his capacity for self-determination "critically impaired." *Schneckloth*, 412 U.S. at 225-26. "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." *Id.* Other factors include age, education,

intelligence, length of detention, if any, and use of physical punishment. *Id.* at 226. Consent must be more than mere acquiescence to an apparently lawful authority. *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (where in response to officers' request to search, defendant stated "you've got the badge, I guess you can," the government failed to meet its burden of showing consent was voluntarily).

In this case, the government has carried its burden of demonstrating that Raymond and Rose's consent was given voluntarily, and not as the result of coercion. Rose and Raymond were in their own home (at separate times) speaking calmly with officers dressed in plain clothes. No officer ever brandished a weapon or raised their voices. The officers were respectful to the parents, and the parents were calm and cooperative. When Raymond spoke with officers, he affirmatively told them they could take the computer. The same thing happened with Rose, who said "take it." Although Raymond and Rose contend that they both stayed silent during the ordeal and never told the officers they could or could not take the computers, the Court finds that the weight of the credible evidence indicates that each in fact expressed their consent to the seizure of the computers. This is supported by Brian's testimony as well as the unlikelihood that after having spoken with detectives about the investigation prior to the request, Raymond and Rose completely stopped talking and remained silent while the police were unhooking the computers in preparation for taking them; the scenario posited by the defendant would in that light be highly unlikely if not contrary to human behavior.

Even if Raymond and Rose did stay silent in response to the request to take the computers and return them later, their silence demonstrates tacit and voluntary consent. This was not a situation in which the Raymond and Rose were merely acquiescing to a show of authority by the officers. Their silence was not "an expression of futility in

resistance to authority or acquiescing in the officers' request," *Worely*, 193 F.3d at 386, but rather was nonverbal conduct demonstrating they were giving consent. The Court concludes, based on the totality of the circumstances, that Raymond and Rose voluntarily gave consent to the search and seizure of the computers at issue here.

## CONCLUSION AND ORDER

The Court concludes that Trejo has standing to challenge the search and that his parents voluntarily consented to the search and seizure of the two computers.

**WHEREFORE**, it is hereby **ORDERED** that Defendant's motion to suppress evidence (docket no. 14) is **DENIED.**

**SO ORDERED.**

        s/Stephen J. Murphy, III
        STEPHEN J. MURPHY, III
        United States District Judge

Dated: March 12, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 12, 2010, by electronic and/or ordinary mail.

        Alissa Greer
        Case Manager